UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER E. USUDE,<br><br>Petitioner,<br><br>v.<br><br>CORINA LUNA, United States Citizenship and Immigration Services Los Angeles Field Office, *et al.*,<br><br>Respondents. | Case No. CV 15-00301-AB (SSx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**TRIAL DATE: JULY 11, 2017** |

    This matter was tried before this Court, sitting without a jury, on July 11-12, 2017.

    Leon B. Hazany of Leon Hazany and Associates appeared on behalf of Petitioner Christopher E. Usude ("Petitioner"). Anthony D. Bianco and Joseph Carrilli, Jr. of the United States Department of Justice appeared for Respondent Corina Luna ("Respondent").

    The Court has heard the admissible evidence presented by the parties and the arguments of counsel. It has considered the credibility of the witnesses and all papers and exhibits presented by the parties for purposes of this trial, including admissions in the Final Pretrial Conference Order. The Court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.

**FINDINGS OF FACT**

**The Parties**

1. Petitioner is a native and citizen of Nigeria and is over the age of 18. Final Pretrial Conference Order ("FPTCO"), ¶¶ 5a-b (Dkt. No. 89). He became a conditional lawful permanent resident of the United States on March 23, 2004. FPTCO, ¶¶ 5l, 5m.

2. Respondent Corina Luna is the Director of the Los Angeles Field Office for United States Citizenship and Immigration Services ("USCIS"). Respondent Susan M. Curda is the Director of the USCIS Los Angeles District Office. Respondent James McCament is the Acting Director of USCIS. Respondent John Kelly was the United States Secretary of Homeland Security. Respondent Jill Eggleston is the Director for the USCIS Freedom of Information Act / Privacy Act Office. Respondent T. Diane Cejka is the Director for the USCIS National Records Center. USCIS and the Department of Homeland Security are also Respondents. FPTCO, ¶ 1.

**Petitioner's Entry into the United States**

3. Petitioner was admitted to the United States on November 29, 2001 through a B1/B2 nonimmigrant visa. FPTCO, ¶ 5d; Trial Tr. at 20:11-25 (C. Usude).

4. After arriving in Los Angeles, Petitioner decided to apply to the University of California, Los Angeles ("UCLA") and California State University, Northridge ("CSUN"). Trial Tr. at 25:5-26:1 (C. Usude).

5. Petitioner received an adjustment of status to nonimmigrant F student status. FPTCO, ¶ 5e. He began studying at CSUN in the spring of 2002. Trial Tr. at 27:1-5 (C. Usude).

**Relationship with Sharrie Campbell**

6. Prior to leaving Nigeria, Petitioner was engaged to a woman named Ejaita. Trial Tr. at 75:14-24 (C. Usude). Ejaita took Petitioner's last name and

became known as Ejaita Usude. Trial Tr. at 77:1-2 (C. Usude). However, Petitioner never married Ms. Usude. Trial Tr. at 75:25-76:1 (C. Usude).

7. Sometime in 2001, Petitioner met Sharrie Campbell, who worked as a legal assistant for Jovi Usude, Petitioner's brother. Dep. Sharrie Campbell at 12:7-17 (Ex. 49).

8. Ms. Campbell is a United States citizen. FPTCO, ¶ 5h.

9. Petitioner and Ms. Campbell began dating, going to restaurants, taking trips together, and spending nights together. Trial Tr. at 29:25-31:24 (C. Usude); Campbell Dep. at 14:2-4, 16:25-17:22.

10. Petitioner and Ms. Campbell married on September 30, 2002 in North Hollywood, California. Trial Tr. at 34:5-6 (C. Usude); Ex. 4, at p. 8. About 20 people attended the ceremony. Trial Tr. at 34:15-21 (C. Usude). Petitioner and Ms. Campbell obtained a marriage certificate memorializing their union. Ex. 4, at p. 8.

11. Petitioner and Ms. Campbell lived together during their marriage. Campbell Dep. at 25:2-3; Trial Tr. at 40:9-23 (C. Usude).

12. Petitioner and Ms. Campbell first lived together in Reseda, California. Trial Tr. at 36:5-14 (C. Usude); Ex. 4, at pp. 6-7. They then moved to an apartment located at 1441 Veteran Avenue in the Westwood Neighborhood of Los Angeles, California. Trial Tr. at 68:8-17. After living in Westwood, Ms. Campbell and Petitioner moved to an apartment on Titus Street in Panorama City, California. Trial Tr. at 46:7-22 (C. Usude); Campbell Dep. at 31:22-32:8.

13. Throughout much of their marriage, Petitioner and Ms. Campbell shared a life together. They lived together, shared expenses, expressed love for each other, cooked for each other, and went out together. Trial Tr. at 72:21-73:7 (C. Usude); Campbell Dep. at 100:25-101:24, 102:4-103:16.

14. Ms. Campbell and Petitioner married for love and not to obtain an immigration benefit. Trial Tr. at 65:23-66:8 (C. Usude); Campbell Dep. at 23:24-25:1, 85:25-86:2, 86:7-15.

15. The relationship between Petitioner and Ms. Campbell began to deteriorate in 2005. Campbell Dep. at 79:7-17. Petitioner and Ms. Campbell separated around 2006. Campbell Dep. at 46:11-15.

16. Petitioner and Ms. Campbell divorced around 2008. Trial Tr. at 153:5-9 (C. Usude).

**Petitioner's Application for Permanent Residence**

17. On January 28, 2003, Ms. Campbell filed a Petition for Alien Relative, Form I-130, with the Immigration and Naturalization Service ("INS"). Ex. 4; FPTCO, ¶ 5g.

18. Also on January 28, 2003, Petitioner filed an Application to Register Permanent Resident or Adjust Status, Form I-485, to adjust his immigration status to that of a permanent resident based on his marriage to Ms. Campbell. FPTCO, ¶ 5i; Ex. 5.

19. Petitioner was interviewed in connection with the Application to Register Permanent Resident or Adjust Status. Trial Tr. at 51:10-21 (C. Usude).

20. On March 23, 2004, USCIS approved Petitioner's Application to Register Permanent Resident or Adjust Status and adjusted Petitioner's status to that of a conditional lawful permanent resident. FPTCO, ¶¶ 5l, 5m; Ex. 5, at p. 5.

**Petitioner's Application to Remove Conditions**

21. On December 29, 2005, Petitioner and Ms. Campbell jointly filed a Petition to Remove Conditions on Residence, Form I-751, with USCIS. FPTCO, ¶ 5n; Trial Tr. at 64:1-4 (C. Usude). In support of the petition, Petitioner and Ms. Campbell submitted multiple documents. FPTCO, ¶ 5p. Some of those documents were falsified.

22. Petitioner and Ms. Campbell submitted a copy of a combined bank statement purporting to show that Petitioner and Ms. Campbell shared a checking and savings account. *See* Ex. 6, at pp. 23-26. The bank statement, which appears to be addressed to Petitioner and Ms. Campbell, covers the period of August 20, 2005

through September 22, 2005. *Id*. While the purported bank statement lists Petitioner and Ms. Campbell as the accountholders, the statement is almost identical to Ejaita Usude's bank statement for the same period. *See* Ex. 12. The beginning and ending balances are the same, the charges to the account are the same, and the dates are the same. *Compare* Ex. 6 at pp. 24-25 *to* Ex. 12. Indeed, the account numbers for both the checking and savings accounts are the same but for a single digit. *Id*. The bank statement was doctored to remove Ms. Usude's name and replace it with Petitioner's and Ms. Campbell's names.

23. Petitioner and Ms. Campbell also submitted a falsified bank statement for the period of October 25, 2005 through November 25, 2005. *See* Ex. 6, at pp. 20-22. The first page of the statement lists two accounts, one savings and one checking. *Id*. The second page of the statement shows "CHIRTOPHER E. USUDE" and "SHARRIE Y. CAMPBELL" as the accountholders for the checking account. *Id*. at p. 21. However, on that same page, the statement lists "EJAITA ANN USUDE" as the accountholder for the savings account. *Id*. The account number listed next to Ejaita Usude's name is the same account number listed on the first page of the bank statement, which is addressed to Petitioner and Ms. Campbell. *See id*. at pp. 20-21. The appearance of Petitioner's ex-fiancé's name on a purported joint bank account shared with Ms. Campbell supports the Court's finding that the bank statement was altered.

24. In addition, Petitioner and Ms. Campbell submitted multiple joint tax returns. Ex. 6, at pp. 7-17. Some of the tax returns spell Ms. Campbell's first name incorrectly. *Id*., at 99. 14, 16. Ms. Campbell testified that she would not have submitted tax forms with an incorrect spelling of her first name. Campbell Dep. at 65:16-66:1.

25. Petitioner submitted the bank statements and tax returns in an effort to prove that he and Ms. Campbell shared a life together and thereby remove the conditions on his residence. Trial Tr. at 170:5-171:14 (C. Usude).

5.

1    26.    On May 11, 2006, USCIS approved Petitioner's Form I-751 and removed the conditions on Petitioner's lawful permanent residence.  FPTCO, ¶ 5q; Trial Tr. at 64:17-65:1 (C. Usude).

**Petitioner's Relationship with Hadiza Gwadabe and Paternity of R.U.**

27.    In late 2008 or early 2009, Petitioner started a relationship with Hadiza Gwadabe in Lagos, Nigeria.  Trial Tr. at 408:15-21 (H. Gwadabe).  Ms. Gwadabe is a United States citizen.  Trial Tr. at 412:3-7 (H. Gwadabe).

28.    While both Ms. Gwadabe and Petitioner were in Nigeria, Ms. Gwadabe became pregnant.  Trial Tr. at 409:1-17 (H. Gwadabe).

29.    When Ms. Gwadabe was seven months pregnant, Petitioner convinced her to move to the United States.  Trial Tr. at 411:2-12 (H. Gwadabe).

30.    Ms. Gwadabe gave birth to her son, R.U., on the morning of November 30, 2011.  Trial Tr. at 408:11-14, 412:16-18 (H. Gwadabe).  Petitioner went to the hospital that day.  Trial Tr. 412:19-21 (H. Gwadabe).

31.    While at the hospital, Petitioner signed a Declaration of Paternity for R.U.  Ex. 7; Trial Tr. at 258:4-15 (C. Usude).  The Declaration of Paternity states, in part, "I declare under the penalty of perjury under the laws of the State of California that I am the biological father of the child named on this declaration and that the information I have provided is true and correct."  Ex. 7.

32.    Despite signing the Declaration of Paternity, Petitioner had doubts about whether R.U. was, in fact, his child.  Trial Tr. at 117:23-118:20 (C. Usude).  For that reason, Petitioner asked for a DNA test to confirm his paternity a few weeks after R.U.'s birth.  Trial Tr. at 415:21-416:2 (H. Gwadabe).

33.    DNA samples were collected from Petitioner and R.U. on December 13, 2011. Ex. 9.  On December 19, 2011, a DNA test confirmed a 99.98% probability that Petitioner was R.U.'s father.  *Id*.

34.    Ms. Gwadabe received a letter with the results of the DNA test.  Trial Tr. at 418:6-10 (H. Gwadabe).  Petitioner sent Ms. Gwadabe a text message indicating

that he, too, had received the results of the DNA test.[1]  Trial Tr. at 418:11-17 (H. Gwadabe).

36. Petitioner initially supported Ms. Gwadabe and R.U. financially by paying their rent and furnishing their apartment in Marina Del Rey, California.  Trial Tr. at 271:23-273:13 (C. Usude), 419:20-422:3 (H. Gwadabe).

36. Around January 2012, Ms. Gwadabe moved to an apartment in Woodland Hills, California with her sister and R.U.  Trial Tr. at 420:10-421:6 (H. Gwadabe).  Petitioner paid rent for the apartment until April 2012.  Trial Tr. at 421:7-422:5 (H. Gwadabe).

37. After April 2012, Petitioner stopped paying rent for Ms. Gwadabe's apartment.  Trial Tr. at 421:7-422:5 (H. Gwadabe).  Petitioner provided some cash support until he completely ceased financial support for R.U. in September 2012.[2]  Trial Tr. at 436:25-437:10 (H. Gwadabe).

**Paternity of K.U.**

38. On March 22, 2012, Amanda Etumadu gave birth to K.U.  Ex. 8.  Petitioner is K.U.'s father.  *Id*.; Trial Tr. at 126:14-127:6 (C. Usude).

**Petitioner's Naturalization Application**

39. On July 5, 2012, Petitioner filed an Application for Naturalization, Form N-400, with USCIS.  FPTCO, ¶ 5t; Ex. 1.

---

[1] Petitioner testified that he did not receive the results of the DNA test until he asked his brother to pick up the results from the lab much later.  Trial Tr. 122:18-22, 124:19-24 (C. Usude).  However, given that Petitioner requested the DNA test in the first place, the Court finds it unlikely that he neither received the test results nor made an effort to obtain them.

[2] Petitioner testified that he provided financial support for R.U. until 2014, although he "could have been off by a year."  Trial Tr. 277:4-12 (C. Usude).  Aside from his own testimony, however, Petitioner provides no evidence that he provided financial assistance for R.U. after September 2012, when Ms. Gwadabe says Petitioner cut off all assistance.  Given Petitioner's burden and weighing the credibility of the witnesses, the Court finds that Petitioner stopped financially supporting R.U. in September 2012.

7.

1    40.    Petitioner signed his N-400 application under penalty of perjury. FPTCO, ¶ 5w.

2    41.    Part 9 of the N-400 application requested information about "all of [Petitioner's] sons and daughters." Ex. 1, at p. 6. Petitioner provided information about his daughter, K.U., but did not provide any information about his son, R.U. *Id.*; FPTCO, ¶¶ 5u, 5v.

3    42.    Question 23 of the N-400 application asked, "Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" Ex. 1, at p. 8. Petitioner answered "No." *Id*.

4    43.    On November 19, 2012, USCIS Immigration Services Officer Tomas Rubalcava interviewed Petitioner to determine Petitioner's eligibility for naturalization. FPTCO, ¶ 5x. Petitioner was placed under oath during the interview. Trial Tr. at 557:19-558:9 (T. Rubalcava); Ex. 1, p. 1.

5    44.    During the interview, Officer Rubalcava orally went through the N-400 application with Petitioner. Trial Tr. at 574:11-20 (T. Rubalcava). When Petitioner orally confirmed the answer to a question, Officer Rubalcava placed a check mark next to the answer in red ink. Trial Tr. at 574:18-25, 584:14-20 (T. Rubalcava).

6    45.    Officer Rubalcava asked Petitioner about Part 9 of the N-400 application, which requests information about "all your sons and daughters." Ex. 1, at p. 6; Trial Tr. at 576:14-21 (T. Rubalcava). Petitioner answered that he had only one child, K.U. Trial Tr. at 576:14-25 (T. Rubalcava). At that time, Petitioner knew R.U. was also his child. Trial Tr. at 418:11-17 (H. Gwadabe); Ex. 7.

7    46.    A red checkmark appears next to Petitioner's answer to Question 23 of the N-400 application, indicating that Petitioner orally confirmed that he had not "given false or misleading information to any U.S. Government official while applying for any immigration benefit . . . ." Ex. 1, at p. 8; Trial Tr. at 574:18-25,

584:14-20 (T. Rubalcava). Petitioner had submitted falsified bank statements in connection with his I-751 petition. Trial Tr. at 64:1-4 (C. Usude); Ex. 6, at pp. 20-26.

47. On December 12, 2013, USCIS denied Petitioner's naturalization application. FPTCO, ¶¶ 5cc, 5dd; Ex. 1, at p. 1.

## CONCLUSIONS OF LAW

### I. JURISDICTION

The Court has jurisdiction over this matter pursuant to 8 U.S.C. § 1421(c), which provides that a person may seek *de novo* review of a denial of a naturalization application from the United States district court for the district in which the person resides.

### II. DISCUSSION

In order to naturalize and become a United States citizen, an applicant must (1) be at least 18 years old; (2) have been lawfully admitted as a permanent resident of the United States; (3) have resided continuously in the United States for a period of at least five years after being admitted as a lawful permanent resident; (4) have been physically present for 30 months of the five years preceding the naturalization application; (5) have resided for at least three months in the state where the application was filed; (6) have resided in the United States continuously from the time of the application for naturalization to the time of admission to citizenship; (7) have been a person of good moral character for the relevant time period; (8) demonstrate an ability to read, write, and speak English; (9) demonstrate a knowledge of the history, principles, and form of the government of the United States; and (10) have not evaded military service. 8 U.S.C. §§ 1423, 1427; 8 C.F.R. § 316.2. "[T]here must be strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." *Fedorenko v. United States*, 449 U.S. 490, 506 (1981). An applicant seeking naturalization has the burden of proving that he meets each requirement by a preponderance of the evidence. 8 C.F.R. § 316.2(b).

The parties only dispute whether Petitioner has satisfied two elements: (1) that

he was lawfully admitted as a permanent resident, and (2) that he has been a person of good moral character for the required time period.

### A. <u>Lawful Permanent Resident</u>

Petitioner claims he has been a lawful permanent resident since his I-485 Application to Adjust Status was approved on March 23, 2004. Respondent argues, however, that Petitioner engaged in marriage fraud, therefore depriving him of his status as a lawful permanent resident.

The lawful permanent residence requirement is a substantive requirement, not simply a procedural one. *Kyong Ho Shin v. Holder*, 607 F.3d 1213, 1217 (9th Cir. 2010). If an applicant was never eligible for lawful permanent residence, he is ineligible for naturalization even if he was granted an adjustment of status. *Monet v. I.N.S.*, 791 F.2d 752, 753 (9th Cir. 1986). For example, an applicant who became a lawful permanent resident as a result of fraud is not considered a lawful permanent resident for naturalization purposes. *Saliba v. Attorney Gen. of United States*, 828 F.3d 182, 192 (3d Cir. 2016).

A marriage is fraudulent "if the bride and groom did not intend to establish a life together at the time they were married." *Bark v. Immigration & Naturalization Serv.*, 511 F.2d 1200, 1201 (9th Cir. 1975). The conduct of spouses following the wedding only informs whether the marriage was legitimate "to the extent that it bears upon their subjective state of mind at the time they were married." *Id.* at 1202.

The Court has found that Petitioner and Ms. Campbell married for love, and not to obtain an immigration benefit. At the time they married, Petitioner and Ms. Campbell had dated for almost a year. They lived together, spent time together, slept together, and went out together. Their marriage did fall apart, but at the time they married, Petitioner and Ms. Campbell intended to share a life together. The marriage therefore was not fraudulent.

While Petitioner's marriage to Ms. Campbell was not fraudulent, Petitioner did submit false bank statements in an effort to remove the conditions on his permanent

residence about three years later. The parties have not provided, and the Court has not found, case law addressing whether a naturalization applicant who legitimately obtained conditional permanent resident status, but removed the conditions through fraud, can be regarded as a lawful permanent resident. On one hand, conditional permanent residents are treated for most purposes as full lawful permanent residents. *See Gallimore v. Attorney Gen. of U.S.*, 619 F.3d 216, 229 (3d Cir. 2010) ("[W]e can perceive of no reason why conditional permanent residents should not be deemed 'lawfully admitted for permanent residence' as of the date their status is initially adjusted."). Petitioner therefore had been a lawful permanent resident and may not have lost that status. On the other hand, any person who procures an immigration benefit through fraud is inadmissible. 8 U.S.C. § 1182(a)(6)(C)(i). Petitioner therefore may have lost his status as a lawful permanent resident when he falsified documents in support of his I-751 petition. The Court need not decide the issue, however, because Petitioner is ineligible for naturalization due to his failure to establish that he has good moral character.

**B. Good Moral Character**

A naturalization applicant must establish that he has been of good moral character for the statutory five-year period preceding the filing of a naturalization application. 8 U.S.C. § 1427(a). Petitioner submitted his N-400 application on July 5, 2012 and therefore must establish good moral character from July 5, 2007.

Under 8 U.S.C. § 1101(f), certain categories of applicants are statutorily barred from establishing good moral character. As relevant here, an applicant who "has given false testimony for the purpose of obtaining" immigration benefits cannot be regarded as a person of good moral character. 8 U.S.C. § 1101(f)(6).

This false testimony bar only applies to oral testimony; it does not refer to written statements. *Kungys v. United States*, 485 U.S. 759, 780 (1988). False testimony includes statements made under oath during a naturalization interview. *Ramos v. I.N.S.*, 246 F.3d 1264, 1266 (9th Cir. 2001).

1    A false statement only precludes a finding of good moral character if the
2    applicant made the statement with the subjective intent of obtaining an immigration
3    benefit. *Kungys*, 485 U.S. at 780. Courts have inferred such a subjective intent where
4    a true answer might have jeopardized a naturalization application. *See Khawatmi v.*
5    *Dep't of Homeland Sec.*, No. 3:08cv1632 MRK, 2011 WL 577330, at *13 (D. Conn.
6    Feb. 9, 2011) (finding that a naturalization applicant's false statement about the
7    paternity of a child was made with the subjective intent to obtain an immigration
8    benefit because a true answer would have led to further inquiry into the validity of his
9    marriage); *Babatunde v. Napolitano*, No. 09 C 2600, 2011 WL 332523, at *9, n.1
10   (N.D. Ill. Jan. 31, 2011) (same); *Garcia-Garcia v. Holder*, No. 08CV1129-LAB
11   (AJB), 2010 WL 1292155, at *6 (S.D. Cal. Mar. 30, 2010) (finding that the petitioner
12   gave false testimony with the intent to obtain an immigration benefit where "he would
13   have had strong motives" to lie when applying for naturalization).

14   Petitioner gave false testimony during his naturalization interview when he told
15   Officer Rubalcava that he only had one child, K.U. Petitioner in fact had another
16   child, R.U., and Petitioner knew R.U. was his child at the time of the interview. Thus,
17   Petitioner knowingly gave false oral testimony during his naturalization interview.

18   Petitioner provided the false testimony about his paternity with the subjective
19   intent of obtaining an immigration benefit. A federal regulation provides that "[an]
20   applicant shall be found to lack good moral character if, during the statutory period,
21   the applicant . . . [w]illfully failed or refused to support dependents." 8 C.F.R.
22   316.10(b)(3)(i). Petitioner had stopped providing any financial support for R.U. by
23   September 2012, two months before the interview. Petitioner therefore had a reason
24   to lie about his paternity of R.U. during the interview – to prevent inquiry into
25   Petitioner's failure to financially support R.U. Accordingly, the Court finds it more
26   likely than not that Petitioner lied about his paternity in order to obtain an immigration
27   benefit.

28   In addition to Petitioner's lie about his paternity of R.U., Petitioner also lied on

his N-400 application by answering "No" to Question 23, "Have you ever given false or misleading information to any U.S. Government official while applying for any immigration benefit or to prevent deportation, exclusion, or removal?" Ex. 1, at p. 8. Petitioner had, in fact, provided false bank statements along with his I-751 petition. Officer Rubalcava placed a check mark next to Petitioner's answer, indicating that Petitioner orally confirmed his answer during the naturalization interview.

Petitioner gave this false testimony with the subjective intent of obtaining an immigration benefit. Answering "Yes" to Question 23 could have jeopardized Petitioner's naturalization application because a person who procures an immigration benefit through fraud is inadmissible. 8 U.S.C. § 1182(a)(6)(C)(i). Indeed, one district court had "no doubt" that a petitioner's false answer to essentially the same question was designed to obtain an immigration benefit. *Khawatmi*, 2011 WL 577330, at *14 (finding that the false testimony bar applied where the petitioner falsely testified that he "never gave any false or misleading information to any Government official while applying for any immigration benefit"); *see also United States v. Zhong*, No. C 11-5112 MEJ, 2013 WL 4647418, at *5, 16 (N.D. Cal. Aug. 29, 2013), *aff'd*, 628 F. App'x 498 (9th Cir. 2015) (concluding that a person lacked good moral character where he falsely answered "No" to Question 23 of his N-400 application). Petitioner would have risked his N-400 application being denied had he answered Question 23 truthfully. The Court therefore concludes that Petitioner answered "No" to Question 23 in order to aid his naturalization application.

Because Petitioner twice provided false testimony during his naturalization interview, Petitioner cannot establish that he has good moral character.

/ / /

/ / /

/ / /

/ / /

/ / /

### III. CONCLUSION

Petitioner lacks good moral character and is ineligible to naturalize. Petitioner's petition for naturalization is **DENIED**. Respondent shall file a proposed judgment within 21 days of this order.

**IT IS SO ORDERED.**

Dated: January 23, 2018

_____
HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE